UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELSIE ELENA INIGUEZ,

    Plaintiff,

    v.

NANCY A. BERRYHILL,

    Defendant.

Case No.  4:17-cv-00093-KAW

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 17, 24

Plaintiff Elisa Elena Iniguez ("Plaintiff") seeks judicial review, via 42 U.S.C. § 405(g), of the Commissioner's final decision, and the remand of this case for benefits or further proceedings.

Pending before the Court is Plaintiff's motion for summary judgment (Dkt. No. 17) and Defendant's cross-motion for summary judgment (Dkt. No. 24).  Having considered the papers filed by the parties, and for the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment, and GRANTS Defendant's cross-motion for summary judgment.

## I.    BACKGROUND

On January 16, 2014, Plaintiff applied for Title II Disability Insurance Benefits, alleging a disability that began on the onset date of August 7, 2013.  (Administrative Record ("AR") 22, 55.)  Plaintiff alleged depression, anxiety, fibromyalgia, forgetfulness, problems with three discs in her neck, middle back and lower back, problems that affected her posterior, having trouble sitting on posterior, having to apply ice to posterior, tightness in neck, shoulder stiffness and stiffness in both hands. (AR 111, 114-15, 124.) Her primary diagnosis was fibromyalgia and her secondary diagnosis was affective (mood) disorders. (AR 123, 142.) The Social Security Administration ("SSA") denied Plaintiff's application initially on May 9, 2014.  (AR 22, 143-46.) On June 2, 2014, Plaintiff then filed a request for reconsideration. (AR 151.) The SSA denied Plaintiff's

application upon reconsideration on September 5, 2014. (AR 22, 153-58.) On September 17, 2014, Plaintiff filed a request for a hearing before an ALJ. (AR 22, 159-60.) The assigned ALJ, Regina L. Sleater, held a hearing on June 8, 2015, at which Plaintiff, Medical Expert ("ME") Dr. Allan N. Levine, M.D. and Vocational Expert ("VE") Robin Scher testified. (AR 22, 45-46, 54-85, 95-110, 174, 180, 191, 193, 196, 198.) The Plaintiff was represented by Attorney Cynthia G. Starkey at the hearing. (AR 22, 45, 47, 433.)

During the hearing, ME Levine confirmed that he saw patients with myofascial pain syndrome before, and Attorney Starkey stipulated to his qualifications. (AR 54-55.) ME Levine also reviewed with Plaintiff several of her impairments, such as not being able to carry the trash out (AR 61), driving takes a lot out of her and "drains her" - especially her shoulders and her neck, which feel like they're going to just collapse from "chronic pain" (AR 61-62), she doesn't cook and buys food that is already cooked like bean burritos, salads, or things that can be placed in a microwave oven (AR 62), she can carry one bag of groceries but it "cannot be heavy" (AR 63), she would not be able to pick up a gallon or a half gallon of milk and put it in a basket (AR 63-64), she can sit down on a gel cushion and with an ice pack on her back for maybe 45 minutes before standing up (AR 64), she has to stand on a cushion with her feet and sometime she eats her breakfast standing up (AR 64-65), she can stand up for around 10 minutes with support (a cushion) on her feet (AR 65), she can walk for maybe three blocks before resting with no assistive devices, e.g. walker or crutches (AR 65-66), she feels stiffness in her arms and shoulders and also feels like her bones will collapse and her shoulders will cave in e.g. caving and stiffness and chronic pain (AR 66), it only hurts her when a doctor touches her trigger points but the pain does not radiate from those locations (AR 67-68).

When ME Levine was asked about the Plaintiff's medically determinable impairments since August 7, 2013, ME Levine stated that the medical records are replete with a diagnosis of fibromyalgia syndrome. (AR 69.) However, a problem that ME Levine had with that diagnosis was that he found no documentation of 9 to 10 to 11 out of 18 bilaterally symmetrical tender points, which are really necessary for that diagnosis. (*Id.*) ME Levine also felt that in lieu of the diffuseness of Plaintiff's complaints of pain, that a diagnosis and a first medically determinable

impairment of a chronic musculoligamentous pain syndrome would possibly be more appropriate and in fact, that diagnosis was also used frequently within the medical record, and he references Exhibit 11-F, page 3 (AR 683) as an example of a diagnosis of chronic pain syndrome with diffused myalgias. (AR 69.) ME Levine also mentioned that the medical records did document complaints of neck pain, back pain, and shoulder pain, which was alleged at least since 2012 as a result of cumulative injury secondary to work, e.g. one note reflecting that the pain started in the Plaintiff's neck and lower back in January of 2009. (*Id.*) ME Levine also said he could tell that Plaintiff had a second medically determinable impairment of chronic neck pain secondary to degenerative disc disease, spondylosis or arthritis of the spine, resulting in mild bilateral neuroforaminal narrowing at the C4/5 and C5/6 level, and mild to moderate narrowing of the left neuroforamen at the C6/7 levels at least since 2012. (*Id.* at 68-69.) Other medical records of note include an MRI that indicated Plaintiff had some degenerative disc disease in the thoracic spine as well as the cervical, an MRI report that indicated that Plaintiff's spinal cord signal was normal and that would indicate an absence of any type of spinal cord compromise, and medical records replete with complaints of neck pain, back pain (upper back, mid-back, and lower back), shoulder pain, feet pain, knee pain, hip pain and hand pain. (*Id.* at 70-71.) ME Levine said the third medically determinable impairment was of chronic back pain secondary to multi-level, lumbosacral degenerative disc disease, spondylosis with bulging or protruding discs at the L3/4 and L4/5 levels resulting in mild to moderate bilateral lateral recess narrowing, which involve the outer parts of the spinal canal at the L4/5 level, and which has been there since at least 2012. (*Id.* at 70.) ME Levine also mentioned that for spinal impairments to meet or equal a listing, there must be evidence of nerve root or spinal cord compromise, and in his opinion, there is no objective evidence of that. (*Id.* at 71.) He also mentioned a multitude of other examples from the medical records indicating normal strength, sensation and reflexes, so he felt that a listing would not be met or equaled relative to the cervical lumbar spine. (*Id.* at 73.)

ME Levine's assessment of Plaintiff's residual functional capacity ("RFC") after reviewing the entire medical record and allowing for some limitations secondary to documented degenerative changes of the cervical and lumbar spine and even thoracic spine, orthopedically and objectively,

he felt that Plaintiff should be capable of lifting occasionally 20 pounds, frequently 10 pounds, and he also felt that she should not be lifting overhead as to avoid a cervical spine extension posture. (*Id.*) He also felt Plaintiff should be able to sit six out of eight hours with customary breaks, stand three out of eight hours but no longer than 45 minutes at one time without the ability of sitting for one to two minutes, and walk two out of eight hours, but no longer than 30 minutes at one time without the ability of sitting for one to two minutes. (*Id.*) ME Levine also felt that Plaintiff could occasionally navigate stairs or ramps with a railing, occasionally kneel, crouch, stoop or bend, but not repetitively, and that she should also avoid ladders, scaffolds, crawling, heavy vibratory machinery, unprotected heights or extreme cold exposure. (*Id.* at 74.) She should also avoid any repetitive rotatory movement or twisting of the cervical spine, e.g. refereeing a tennis match, and he also felt she had unlimited use of the upper extremities for fine and gross manipulation. (*Id.*) ME Levine also said he didn't see any need for assistive devices or special accommodations in a workplace, but subjectively, she mentions the gel pad, which probably would help her sit, and two customary breaks amounting to two hours, which would also be helpful; however, he doesn't understand at all about Plaintiff's use of a cushion to "support her feet and ankles." (*Id.* at 75-76.)

VE Scher testified at the hearing that Plaintiff's past work can be characterized, according to the Dictionary of Occupational Titles ("DOT") as administrative clerk, DOT 219.362.010, which is customarily performed as light with a specific vocational preparation ("SVP"), which measures the skill level required for an occupation, of 4 and which is performed as sedentary. (*Id.* at 95-96.) The ALJ then proposed a hypothetical person to VE Scher who had a similar background with Plaintiff. (*Id.* at 97.) When the ALJ added the limitations of occasional public contact and occasional changes in the workplace with no complex tasks, VE Scher said that hypothetical person could not perform Plaintiff's past work. (*Id.* at 98-99.)

Other jobs that VE Scher noted were laundry worker, DOT 202.685-010, with a light expense level of an SVP of 2, with 120,000 positions nationally; cleaner, housekeeping, DOT 323.687-014, with a light expense level of an SVP of 2, with approximately 220,000 nationally; photocopying machine operator, DOT 207.685-014, with a light expense level of an SVP of 2, and approximately 70,000 nationally; and office helper, DOT 239.567-010, with a light expense level

of an SVP of 2, and approximately 65,000 nationally. (*Id.* at 100.) After the ALJ asked VE Scher if the hypothetical worker was going to be off-task 25 percent of the time and whether that would affect employment, VE Scher said yes and nobody would be able to maintain a job off-task that much. (*Id.* at 100-01.) For being off-task 15 percent of the time, the office helper and office jobs may allow it, but 15 percent would be the top or maximum, a laundry worker might have some possibility of being available, as well as the photocopy machine operator, due to downtime. (*Id.* at 101.) For absences, most employers tolerate one time a month and VE Scher read a study recently saying some employers are willing to put up with two to three absences a month. (*Id.* at 102.) A job that was totally data entry or jobs involving repetitive computer use would also be inappropriate, but at the jobs Plaintiff did before, it was uncertain how much repetitive computer work was done because such jobs don't always require intense computer work. (*Id.* at 103.)

The ALJ issued an unfavorable decision on August 27, 2015, finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 7, 2013 (the alleged onset date) through the date of the decision. (AR 19-21, 39.) The ALJ also found Plaintiff to have the severe impairments of chronic pain syndrome with diffuse myalgias, degenerative disc disease and spondylosis of the cervical, thoracic, and lumbar spine, major depressive disorder and anxiety. (AR 20, 24.) On October 13, 2015, Plaintiff filed a request for review of the ALJ's decision. (AR 16-18.) The Appeals Council denied Plaintiff's request for review on November 10, 2016. (AR 1-7.) On January 9, 2017, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). (Compl., Dkt. No. 1.) On September 20, 2017, Plaintiff filed a motion for summary judgment. (Plf.'s Mot., Dkt. No. 17.) On February 2, 2018, Defendant filed an opposition as well as cross-motion for summary judgment. (Def.'s Opp'n, Dkt. No. 24.) On February 15, 2018, Plaintiff filed a reply brief. (Plf.'s Reply, Dkt. No. 26.)

## II.    LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is "more than a mere scintilla but less than a

preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under SSA regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir.1998). At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721. If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commissioner proceeds to step three, and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is disabled. *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments. 20 C.F.R. § 404.1520(e). If the claimant can perform such work, he is not disabled. 20 C.F.R. § 404.1520(f). RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity. 20 C.F.R. § 404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick*, 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante*, 262 F.3d at 953-954. The burden shifts to the Commissioner in step five. *Id.* at 954.

### III.    THE ALJ'S DECISION

On August 27, 2015, the ALJ issued an unfavorable decision.  (AR 19, 39.)

At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since August 7, 2013, the alleged onset date.  (AR 24.)

At step two, the ALJ identified the following severe impairments: chronic pain syndrome with diffuse myalgias, degenerative disc disease and spondylosis of the cervical, thoracic, and lumbar spine, major depressive disorder, and anxiety. (*Id.*) The ALJ stated that the above listed medical impairments were severe because they caused more than a minimal effect on Plaintiff's ability to perform basic work activities. (*Id* at 24-25.) Moreover, the ALJ notes that pursuant to Social Security Ruling (SSR) 12-2p, a diagnosis of fibromyalgia must be established by showing that a claimant's impairment would satisfy the 1990 ACR Criteria for the Classification of Fibromyalgia or alternatively the 2010 ACR Preliminary Diagnostic Criteria and generally, the claimant must meet the criteria of widespread pain in all quadrants of the body and axial skeleton pain that persisted for at least three months, at least 11 out of 18 positive tender points on a physical examination and/or repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occuring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), walking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome, and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occuring conditions were excluded. (*Id.* at 25.) The ALJ also stated that although the record reflects a diagnosis of fibromyalgia, it appears that it was based largely on the claimant's self-reported diagnosis and not objective findings. (*Id.*) The ALJ also indicated that ME Levine testified that Plaintiff's symptoms and lack of widespread pain and tender points suggests that the Plaintiff's fibromyalgia diagnosis was not appropriate, and the diagnosis of chronic pain syndrome with diffuse myalgias was more appropriate, which is consistent with the medical record – particularly assessments from Plaintiff's treating doctor, Cindy S. Wun, M.D. and an examining pain management specialist, Michael Brook, M.D. (*Id.*) The ALJ also concluded that Plaintiff's alleged hip, shoulder, and hand pain were not medically determinable impairments because there were no signs or laboratory findings to substantiate those allegations and no acceptable medical

1  source diagnosed a hip, shoulder, or foot impairment using medically acceptable clinical and

2  laboratory diagnostic techniques. (*Id.*) The ALJ states that the evidence of record indicates that

3  Plaintiff had normal range of motion in all extremities and normal muscle strength, but her general

4  allegations of body pain were considered under her medically determinable impairment of chronic

5  pain syndrome. (*Id.*)

6  At step three, the ALJ found that Plaintiff did not have an impairment or combination of

7  impairments that met or medically equaled a listed impairment. (*Id.*) The ALJ explained that after

8  she reviewed the evidence, she found none of the listed impairments met the criteria of the listed

9  impairments. (AR 25.) The ALJ also noted that ME Levine testified that Plaintiff's impairments do

10  not meet or medically equal listing 1.04 because Plaintiff lacks the requisite motor and sensory

11  deficits, and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in

12  psuedoclaudication, which is consistent with the medical record findings. (*Id.* at 25-26.)

13  In making the finding of the severity of Plaintiff's mental impairments not meeting or

14  medically equaling the criteria of listings 12.04 or 12.06, the ALJ considered whether the

15  "paragraph B" criteria were satisfied, and to do so, the mental impairments of Plaintiff must result

16  in at least two of the following: (1) marked restriction of activities of daily living; (2) marked

17  difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration,

18  persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. (*Id.* at

19  26.) A marked limitation means more than moderate but less than extreme, and repeated episodes

20  of decompensation, each of extended duration, means three episodes within 1 year, or an average

21  of once every 4 months, each lasting for at least 2 weeks. (*Id.*)

22  In activities of daily living, the ALJ found that Plaintiff had no more than a mild restriction

23  because she alleged that she had difficulties getting out of bed, cleaning, shopping, cooking, and

24  dealing with personal hygiene and grooming, yet is able to drive a car, her hygiene and appearance

25  appeared appropriate at doctor visits, she was able to manage her own finances, cook simple

26  prepared meals, and assist with light household chores. (*Id.*)

27  In social functioning, the ALJ found that Plaintiff had no more than moderate difficulties

28  because she alleged feeling anxious around crowds and reported limited social activities, yet she

1   also reported leaving the house daily to drive her daughter to school, going grocery shopping three

2   times a week, and going to church and other social events with family and friends. (*Id.*) The ALJ

3   also stated that examining doctors indicated that Plaintiff was cooperative and maintained good

4   eye contact during appointments, which is also consistent with no more than moderate difficulties

5   for social functioning. (*Id.*)

6           With regard to concentration, persistence and pace, the ALJ found that Plaintiff had no

7   more than moderate difficulties because Plaintiff alleged experiencing difficulties with memory,

8   concentration, and following instructions, yet the claimant was still able to handle her own

9   finances, drive, grocery shop, prepare simple meals, clean laundry, make regularly scheduled

10  doctors' appointments and attend weekly physical therapy sessions. (*Id.*) The ALJ additionally

11  noted that generally the mental status examinations indicated that Plaintiff had average cognitive

12  functioning, and that she did not have any limitations with regards to concentration, memory, or

13  pace. (*Id.*) The ALJ also indicated that Plaintiff maintained attention and concentration during the

14  hearing. (*Id.*)

15          With respect to episodes of decompensation, [1] the ALJ found that Plaintiff experienced

16  none, which have been of extended duration. (*Id.*) The ALJ indicates that although Plaintiff has

17  reported making three suicide attempts between 2012 and 2013 without emergency room or other

18  medical treatment necessary, and she reported having suicidal thoughts throughout the relevant

19  period, the progress notes do not support that the claimant had any periods of decompensation for

20  an extended period of time. (*Id.* at 26-27.) Also, although Plaintiff's therapist petitioned for a 5150

21  involuntary psychiatric hold due to concerns over the Plaintiff's reported suicidal ideation on one

22  occasion, the Plaintiff was released from the hospital the same day after an examination, and her

23  treating psychiatrist has since indicated the Plaintiff does not meet the criteria for a 5150

24  commitment. (*Id.* at 27.) Moreover, the ALJ mentioned that Plaintiff has not required any inpatient

25  hospitalizations for worsening of symptoms. (*Id.*) Thus, the ALJ concluded that because Plaintiff's

26

27  ───────────────
    [1] The term "episodes of decompensation" is "used by psychiatrists and psychologists to describe
28  the deterioration of the mental health of an individual who, up till that point, was maintaining his
    or her mental illness." *See* https://www.disabilitysecrets.com/mic2.html

9

1   mental impairment did not cause at least two "marked" limitations or one "marked" limitation and

2   "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are

3   not satisfied. (*Id.*)

4          The ALJ also found that the evidence fails to establish the presence of the "paragraph C"

5   criteria. (*Id.*) The ALJ noted that to satisfy the C criteria of listing section 12.06, the record must

6   contain a medically documented history of generalized persistent anxiety resulting in a complete

7   inability to function independently outside the area of one's home. (*Id.*) Thus, the ALJ held that

8   because the record was devoid of such evidence, Plaintiff did not satisfy the C criteria of listing

9   section 12.04 or 12.06. (*Id.*)

10          At step four, the ALJ determined that Plaintiff had the RFC to perform light work as

11   defined in 20 CFR 404.1567(b) except lifting and or carrying no more than ten pounds frequently

12   and twenty pounds occasionally; sitting for up to six out of eight hours for no more than two hours

13   at a time, standing for three out of eight hours for 45 minutes at a time with a one to two minute

14   sitting break after 45 minutes; walking for two out of eight hours with one to two minute sitting

15   break after 30 minutes; occasional climbing of stairs with rails; occasional climbing of ramps,

16   kneeling, crouching, stooping, and bending; no ladders, ropes, and scaffolds; no overhead reaching

17   with left upper extremity; no crawling; no vibrations, no hazards like heavy machinery and work

18   at unprotected heights; no extremes of cold; no repetitive rotary cervical motion but no limit on

19   non-repetitive cervical motion, except for looking up; and no limitation of upper extremity for fine

20   and gross manipulation. (AR 27-28.) Additionally, the ALJ held for Plaintiff's RFC that the

21   Plaintiff is limited to occasional detailed tasks, occasional contact with the public, no more than

22   occasional changes in workplace environment, and no complex tasks but no limitation on simple

23   tasks. (*Id.* at 28.) Moreover, the Plaintiff could be off task ten percent of the workday. (*Id.*)

24          In making this finding, the ALJ considered all symptoms and the extent to which these

25   symptoms can reasonably be accepted as consistent with the objective medical evidence and other

26   evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p, and the ALJ

27   has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527

28   and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (*Id.*)

United States District Court
Northern District of California

The Plaintiff alleged the following disabling conditions: depression; anxiety; fibromyalgia; forgetfulness; pain in the three neck discs, middle back, and lower back; problems that affect posterior; having trouble sitting on posterior; having to apply ice to posterior; tightness in neck; shoulder stiffness; hand stiffness; and panic attacks. (AR 28, 248-55.) In a representative brief, Plaintiff's representative also indicated disability based on Plaintiff's chronic back and neck pain, fibromyalgia, and depression. (AR 28, 307-09.) In subsequent disability and function reports, Plaintiff reported worsening pain, anxiety and depression; suicidal thoughts; problems with personal care; needing help with housework and grocery shopping; and an inability to sit, walk and stand for long periods. (AR 28, 47-110, 258-68, 272-78, 311-24, 1499-1503, 1504-09.) She also reported difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, seeing, memory, completing tasks, concentrating, understanding, following instructions, using hands, and handling stress and changes in routine. (AR 28, 258-68, 311-24, 1499-1503.) She also reported having suicidal thoughts, being lethargic, and needing assistance from family members with chores. (AR 28, 47-110, 258-68, 311-24.) At the hearing, Plaintiff also reported that she is in constant pain and is unable to work, as she gets anxiety, feels overwhelmed, is unable to concentrate, gets anxious when around groups of people, and has difficulties using her hands to type (AR 28, 47-110.) Plaintiff also reported that she could sit about 45 minutes before needing to stand, if she had gel and an ice pack and that she could stand about ten minutes (if on a cushion) and reported being able to walk about three blocks before needing to rest. (AR 28-29, 47-110.)

Thus, after careful consideration of the evidence, the ALJ found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in the rest of the ALJ's decision (SSR 96-7p). (AR 29.) The ALJ also noted that Plaintiff had a strong work history as a Data Analyst at the County of San Mateo for close to 15 years, "which speaks highly to her credibility" and Plaintiff filed a workers compensation claim in March 2012 and was briefly off work during this time. (AR 28.) Nonetheless, the ALJ indicates that the record reveals that the Plaintiff's allegedly disabling impairments were present at approximately the same level of severity prior to

1    her alleged onset date and yet she was able to return to work at substantial gainful activity levels.

2    (AR 29, 339-95, 611-80.) The ALJ additionally points out that the Plaintiff's impairments did not

3    prevent the Plaintiff from working, albeit with accommodations, strongly suggests that the

4    Plaintiff's condition is not disabling. (AR 29.) Yet, while the ALJ recognized that the Plaintiff's

5    impairments prevented her from returning to her past work, the inability to do one's past work

6    does not establish "disability" for social security purposes if the individual can do other, less-

7    demanding work, which the objective and opinion evidence of record supports. (*Id.*) The ALJ

8    states that this is further supported by the Plaintiff's own statements to her psychiatrist about

9    reaching out to her employer about returning to work with a different job that could accommodate

10    her disability. (AR 29, 1304.) The ALJ additionally indicates that the records suggest that there

11    may be reasons, other than disability, that explain why the Plaintiff does not want to return to her

12    previous position. (AR 29, 1334.)

13        The ALJ further notes that despite Plaintiff's alleged chronic pain and extreme functional

14    limitations, the record indicates that Plaintiff has engaged in relatively normal activities such as

15    driving her daughter to and from school every day, driving herself to doctor appointments, and

16    driving to Redwood City and other places that were 30 minutes or more away, going grocery

17    shopping three times a week and walking the aisles without an assistive device, being able to

18    perform light household chores such as laundry and dishes and prepare simple meals and salads.

19    (AR 29, 47-110.)  She also reported attending weekly psychotherapy sessions, exercising,

20    attending physical and aqua therapy sessions two to three times a week, and attending family

21    gatherings, church events, and other social events, which tend to suggest the Plaintiff's activities,

22    are not as limited as alleged. (AR 29, 47-110, 472, 487, 794, 963, 1304.)

23        Moreover, the ALJ stated that Plaintiff's subjective allegations of pain and symptoms were

24    not entirely consistent with the medical evidence of record. (AR 29.) For example, the records

25    document that Plaintiff had received regular treatment for her alleged pain and functional

26    limitations, including prescription pain medication and muscle relaxers, physical and aqua therapy,

27    acupuncture, a TENS trial, a H-wave trial, and epidural steroid injections, with reports of some

28    improvement in pain relief and improved range of motion. (AR 30, 339-95, 512-14, 515-38, 539-

610, 681-764, 771-91, 799-875, 894-960, 1332-1380, 1381-1408, 1499-1503, 1504-09, 1510-18.) The ALJ also points out that despite the Plaintiff's allegations of pain, physical examinations generally indicate the Plaintiff was not in acute distress, and she has normal posture and gait. (AR 30, 411-502, 539-610, 611-80, 771-91, 1381-1408, 1499-1503, 1504-09, 1510-18.) Plaintiff also exhibited minimal tenderness to palpation of the posterior trapezius region and posterior shoulders, and she had full range of motion of bilateral shoulders, elbows and wrist and full range of motion of her hips, knees and ankles. (AR 30, 539-610, 611-80, 771-91, 1499-1503.) Moreover, Plaintiff exhibited some tenderness to palpation over the lumbar spine but she had nearly full active range of motion of the cervical and thoracic spine, and straight leg raise tests were negative bilaterally. (AR 30, 539-610, 611-80, 771-91, 1499-1503, 1510-18.) In addition, Plaintiff's cranial nerves were observed on physical examination to be grossly intact, her motor strength was 5/5 and symmetric in all upper and lower extremities, and she had normal sensory functioning and reflexes. (*Id.*) Furthermore, the ALJ states that the imaging studies do not support the Plaintiff's allegations of disabling symptoms and limitations. (AR 30, 539-610.) For instance, a September 2012 MRI indicated relatively mild degenerative changes with an annular fissure at L4-L5 and a small central protrusion which contributes to bilateral lateral recess narrowing at this level. (AR 30, 540.) A July 2012 cervical spine MRI showed posterior disc osteophyte complex with a small central disc protrusion at the T2-3 level, which causes mass effect on the anterior aspect of the spinal cord but overall only results in mild central canal stenosis and mild to moderate left foraminal narrowing at C6-7 and mild bilateral neural foraminal narrowing at C4-5 and C5-6. (AR 30, 542-42.) In February of 2013,

Next, the ALJ addressed the opinion evidence. (AR 30.) In February of 2014, an examining rheumatologist indicated that there was no evidence of any significant inflammatory disease or unusual degenerative changes and suggested that Plaintiff increase her aerobic activities. (AR 30, 1334.) With regards to Plaintiff's allegations of chronic pain, the record indicates that it has been recommended that Plaintiff receive treatment from a pain management specialist or a pain psychologist to help her learn to better cope and manage her pain symptoms to improve functioning and regularly exercise. (AR 30, 509-11, 1381-1408, 1499-1503.) The ALJ

13

1   states that despite recommendations that Plaintiff regularly exercise and participate in physical and

2   aqua therapy, Plaintiff testified at the hearing that she is no longer exercising or getting physical

3   therapy. (AR 30, 47-110, 515-38, 539-610, 681-764, 963, 1384, 1499-1503.)

4       The ALJ assigned the opinions of Dr. P.A. Talcherkar, M.D. and Dr. H. Pham, M.D. less

5   weight because they did not have the benefit of hearing level evidence, including the Plaintiff's

6   testimony regarding pain, symptoms, and activities of daily living, which support finding

7   additional limitations. (*Id.*) The ALJ also gave the opinion of Dr. Cindy Wun, M.D. limited weight

8   because it appeared to be largely based on the Plaintiff's reported subjective limitations and do not

9   correspond with Dr. Wun's objective physical examination findings, which generally indicated that

10  the Plaintiff was not in acute distress, had full strength, full range of motion, and she experienced

11  improvements with medication. (AR 31-32, 339-95, 876-93, 894-960, 1332-80.) The ALJ further

12  states that Dr. Wun's limitations are inconsistent with the Plaintiff's reported activities of daily

13  living, which involve regular driving, grocery shopping, and other activities inconsistent with

14  these extreme limitations. (AR 32.) As to the reports from various physicians who conducted

15  physical examinations of Plaintiff in connection with her Workers Compensation benefits claim,

16  the ALJ did not give them any special weight because the standards for determining disability in

17  Workers Compensation cases are completely different from the standards used in Social Security

18  cases, and the Workers Compensation cases fall within two extremes: favoring the individual who

19  filed the claim or favoring the insurance company. (*Id.*) Nonetheless, the ALJ stated that she fully

20  reviewed and considered all of these reports, including the findings and opinions about the

21  Plaintiff's ability to work and functional limitations, and considered those opinions in the

22  assessment of the Plaintiff's RFC, as required. (*Id.*)

23      The ALJ also gave the opinion of Dr. Felicia Radu, M.D. of Spines and Sports Medical

24  Group limited weight because Dr. Radu was a paid consultant for the Plaintiff's Worker

25  Compensation claim and assessed limitations that were specific to the Plaintiff's former job. (*Id.*)

26  Furthermore, the ALJ points out that Dr. Radu's assessed limitations conflict with one another and

27  the changes are not supported by changes in the objective medical evidence, e.g. while the record

28  supports the Plaintiff had some limitations in lifting, pushing, and pulling, the assessed limitations

1    are not as significant as opined by Dr. Radu given the minimal objective physical evidence and the

2    Plaintiff's activities of daily living, which includes doing light laundry and carrying light groceries.

3    (*Id.* at 32-33.) The ALJ also gave the opinion of Dr. Christian Bocobo, M.D. partial weight

4    because he did not provide specific work related limitations but agreed with him about his

5    assessment that Plaintiff is unable to return to her past work. (*Id.* at 33.) The ALJ also gave little

6    weight to the opinions on Plaintiff's ability to work that preceded her alleged onset date (August 7,

7    2013) because they were not relevant to the period at issue and the Plaintiff subsequently returned

8    to her work at substantial gainful activity levels until her alleged onset date (AR 611-80), even

9    though all the medical evidence of record – including the evidence which predates the Plaintiff's

10   alleged onset date – was considered by the ALJ in determining the Plaintiff's RFC. (AR 33.)

11        For Plaintiff's medical impairments, the ALJ gave the opinion of Dr. Vinh Q. Thai, M.D.

12   that Plaintiff was unable to work – and the GAF scores of 45-48 Dr. Thai gave Plaintiff, indicating

13   serious symptoms or impairment in functioning – little weight because they do not appear to be

14   wholly consistent with progress notes, which document the Plaintiff's significant improvement

15   with prescribed medication and psychotherapy. (AR 34, 1277-1328, 1492-93.) Moreover, the ALJ

16   notes Dr. Thai's opinions are not consistent with mental status examination findings, the progress

17   notes which indicate significant improvements in symptoms, and the Plaintiff's activities of daily

18   living. (*Id.*) Moreover, the Plaintiff reported a higher GAF score of 55 during an emergency room

19   visit. (AR 34, 398-410.) The ALJ also asserts that Dr. Thai's assessment is inconsistent with the

20   other examining and treating doctors' assessments, which indicate that her mood was improved

21   with medication and her depression was mild to moderate, which was given greater weight. (AR

22   34, 339-395, 398-410, 792-98, 1384.)

23        The assessments of treating providers at the Gronowski Center including Catherine Hall,

24   Yotam Heineberg, Psy.D, and Sandra Marcias, Ph.D. indicating that Plaintiff had normal social

25   interactions with the therapist, supervisors, and clinic staff, with no direct behavior observations

26   being made based on clinical observations and diagnostic testing, was given great weight by the

27   ALJ because those opinions were internally consistent with the other objective mental status

28   examination findings. (AR 34-35.) The ALJ further notes that the disparity between the Plaintiff's

alleged symptoms and the clinical observations further supports that the Plaintiff's allegations are not entirely consistent. (AR 35.) The ALJ also gave great weight to the opinion of clinical psychologist Richard A. Starrett, Ph.D. because it was consistent with his psychological consultative examination findings and the objective findings of record, which shows that Plaintiff's concentration and memory are within normal limits and the Plaintiff was cooperative during doctors' appointments, and Plaintiff's activities of daily living which included social activities with friends and family members, as discussed above. (*Id.*) The ALJ also gave the opinion of psychological medical consultant Harvey Bilik, Psy.D. great weight because although such consultants are not treating or examining sources, they had the opportunity to independently review the records in the case, and their opinions are consistent with the objective evidence of record and the Plaintiff's ability to drive, grocery shop every three days and maintain long-term friendships with friends and co-workers. (*Id.*)

The ALJ also considered the observations of non-medical sources and third parties in relation to how the Plaintiff's impairments affected her ability to work. (*Id.* at 34-35.) In that regard, the ALJ carefully considered a third party function report from the Plaintiff's co-worker and friend, Ms. Anita Williams, whose statement for the most part corroborates the testimony of the Plaintiff regarding the severity and nature of her symptoms. (*Id.* at 35-36.) Notwithstanding that corroboration, the ALJ still gave the opinion of Ms. Williams little weight because while the ALJ agrees that Plaintiff is unable to return to the demands of her past work, the ALJ does not find convincing evidence that the Plaintiff's limitations preclude all work. (*Id.* at 36.) The ALJ states that Ms. Williams has not had the opportunity to personally observe the Plaintiff on a daily basis since she has stopped working, and many of the alleged limitations were based on what the Plaintiff reported to her. (AR 36, 325-35.) Moreover, the ALJ remarked that Ms. Williams does not have the medical training necessary to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms. (AR 36.) Furthermore, by virtue of Plaintiff's relationship with Ms. Williams, the ALJ stated that she could not consider Ms. Williams to be a disinterested third party witness whose statements would not tend to be colored by affection for Plaintiff and a natural tendency to

1 | agree with the symptoms and limitations the Plaintiff alleges. (*Id.*) When considered in

2 | conjunction with the other substantial evidence as outlined above, the ALJ concluded that the

3 | stated limitations from Ms. Williams are inconsistent with other substantial evidence in this claim,

4 | including the objective medical evidence. (*Id.*)

5 | The ALJ also gave the determinations made by the County of San Mateo Human

6 | Resources Department no weight because the standards used by them are different than the

7 | standards used by the SSA and the opinions do not indicate the medical support for the finding or

8 | specific functional limitations supporting a finding of disability. (*Id.* at 37.) The ALJ also

9 | mentioned that she considered the statements in the Plaintiff's representative brief but finds the

10 | evidence of record supports the Plaintiff's ability to perform a range of work at the light exertion

11 | level. (*Id.*) In sum, the ALJ states that the RFC assessment is supported by the objective medical

12 | evidence contained in the record, e.g., as documented above, the Plaintiff presents with positive

13 | findings of chronic pain syndrome, neck pain, back pain, anxiety, and depression, which limit the

14 | Plaintiff to less than the full range of light work with the limitations identified. (*Id.*) Also, due to

15 | the Plaintiff's back impairments and chronic pain syndrome, the ALJ asserts that the

16 | aforementioned physical limitations are appropriate and are also supported by the medical

17 | evidence and the opinion testimony of ME Levine. (*Id.*) Moreover, due to the combined effects of

18 | the Plaintiff's chronic pain syndrome, anxiety, and depression, the ALJ declares that the mental

19 | limitations in the RFC are further appropriate, and the functional limitations are consistent with

20 | the mental status examination findings and the opinion evidence of the psychological consultative

21 | examiner and the State agency medical consultants, which were given great weight to by the ALJ.

22 | (*Id.*) In addition, due to the combined effects of the Plaintiff's alleged pain, which is documented

23 | throughout the record, the ALJ finds that Plaintiff would be off task ten percent of the workday.

24 | (*Id.*) The ALJ also states that to the extent that Plaintiff describes functional limitations more

25 | severe than set forth above, her subjective complaints cannot be fully credited. (*Id.*) Although

26 | Plaintiff has received treatment for her allegedly disabling impairments, the ALJ opines that such

27 | treatment has been essentially routine and conservative in nature as treatment notes in the record

28 | do not sustain the Plaintiff's allegations of disabling symptoms and limitations, and suggest that

1  the Plaintiff's condition has improved with conservative treatment. (*Id.*) The ALJ also notes that in

2  determining the Plaintiff's RFC, she considered the opinion evidence in accordance with the

3  requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (*Id.*)

4        At step five, the ALJ found the Plaintiff unable to perform any past relevant work. (*Id.*)

5  The ALJ notes that VE Scher testified at the hearing that Plaintiff's past work as an administrative

6  clerk (DOT 219.362-010, SVP 4) was customarily performed at a light exertional level and was

7  performed at the sedentary exertional level. (AR 37, 47-110.) VE Scher also opined that an

8  individual with the same age, vocational profile, educational level, and RFC would not be able to

9  perform the Plaintiff's past work. (*Id.*) As a result, the ALJ stated that she was persuaded by VE

10  Scher's testimony and found that Plaintiff was unable to perform her past relevant work as it

11  exceeded her RFC. (*Id.* at 37-38.) The ALJ then indicated that Plaintiff was born on September 19,

12  1964 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged

13  disability date, and that Plaintiff subsequently changed age category to closely approaching

14  advanced age. (*Id.* at 38.) The ALJ also noted that Plaintiff has at least a high school education, is

15  able to communicate in English, with Plaintiff stating she took some college coursework. (*Id.*)

16        The ALJ then concluded that considering the Plaintiff's age, education, work experience,

17  and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can

18  perform. (*Id.*) If the Plaintiff can perform all or substantially all of the exertional demands at a

19  given level of exertion, the Medical-Vocational Rules direct a conclusion of either "disabled" or

20  "not disabled" depending upon the Plaintiff's specific vocational profile (SSR 83-11). (*Id.*) When

21  the Plaintiff cannot perform substantially all of the exertional demands of work at a given level of

22  exertion and/or has nonexertional limitations, the Medical-Vocational Rules are used as a

23  framework for decision making unless there is a rule that directs a conclusion of "disabled"

24  without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and

25  83-14). (*Id.*) If the Plaintiff has solely nonexertional limitations, section 204.00 in the Medical-

26  Vocational Guidelines provides a framework for decisionmaking (SSR 85-15). (*Id.*)

27        The ALJ declared that if the Plaintiff had the RFC to perform the full range of light work, a

28  finding of "not disabled" would be directed by Medical-Vocational Rule 202.21 and Rule 202.14.

(*Id.*) The ALJ notes, however, that Plaintiff's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. (*Id.*) To determine the extent to which these limitations erode the unskilled light occupational base, the ALJ asked VE Scher whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (*Id.*) VE Scher testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the following (with the ALJ leaving out the position VE Scher mentioned of cleaner, housekeeping, DOT 323.687-014, with light exertion and an SVP of 2, with about 220,000 jobs nationally):

- Laundry worker, domestic (D.O.T. 202.685-010; light exertional level, SVP of 2) with approximately 120,000 jobs available in the national economy;
- Photocopy machine operator (D.O.T. 207.685-014; light exertional level, SVP of 2) with 70,000 jobs available in the national economy; and
- Office Helper (D.O.T. 239.567-010; light exertional level, SVP of 2) with 65,000 jobs available in the national economy. (*Id.* at 38-39)

The ALJ also determined, pursuant to SSR 00-4p, that VE Scher's testimony was consistent with the information contained in the Dictionary of Occupational Titles or DOT, with the exception of the limitation on repetitive twisting, sit/stand option, overhead reaching, and time off task, which the DOT does not address. (AR 39.) The ALJ nonetheless pointed out that VE Scher testified that she based her testimony regarding such limitations on her education and experience in the field. (AR 39, 47-110.) Therefore, based on the testimony of VE Scher, the ALJ concluded that considering Plaintiff's age, education, work experience and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Thus, the ALJ asserts that a finding of "not disabled" is therefore appropriate under the framework of the above-cited rules. (AR 39.) As a result, the ALJ found Plaintiff not being under a disability, as defined in the Social Security Act, from August 7, 2013, through the date of this decision. (*Id.*) The ALJ also finally concluded that based on the application for a period of disability and disability insurance benefits protectively filed on January 16, 2014, Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act. (*Id.*)

## IV.    DISCUSSION

Plaintiff appeals the ALJ's decision on three presented issues.  First, did the ALJ err in her evaluation of treating source opinions? (Plf.'s Mot. at 4.) Second, did the ALJ have clear and convincing reasons for discrediting Plaintiff Ms. Iniguez's testimony? (*Id.*) Third, did the ALJ meet her burden of proof at Step Five? (*Id.*)

### A.    The ALJ's Evaluation of The Treating Source Opinions

In evaluating medical evidence from different physicians, the Ninth Circuit distinguishes among the opinions of three types of physicians.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The three types are classified as: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians).  *Id.*  A treating physician's opinion is entitled to controlling weight if it is well-supported and consistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).  The opinions of treating medical sources may be rejected only for clear and convincing reasons if not contradicted by another doctor, and, if contradicted, only for specific and legitimate reasons supported by substantial evidence.  *Lester*, 81 F.3d at 830.  Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.* at 830-31; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence").  Where the record contains conflicting medical evidence, the ALJ must make a credibility determination and resolve the conflict. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003)).  "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*m 554 F.3d 1219, 1228 (9th Cir. 2009) (citations omited).

Plaintiff argues that the ALJ committed error by rejecting the opinions of treating doctors without providing legitimate reasons supported by substantial evidence. (Pl.'s Mot. at 12.)

Moreover, Plaintiff avers that the ALJ failed to weigh the clinician's opinion using the appropriate factors required by the federal regulations. (*Id*.) Plaintiff also asserts that in this case it appears as though the ALJ started with her conclusion that Plaintiff was not disabled, crafted an RFC to fit that conclusion, and then found any evidence that did not support that RFC to be discredited by the fact that it was more restrictive than her RFC allowed. (*Id*. at 13.)

### 1. Dr. Cindy Wun

Plaintiff indicates that Dr. Cindy Wun, Plaintiff's treating primary doctor, provided an opinion on a number of different functional limitations, including Plaintiff's ability to sustain work over an entire workday and workweek. (*Id*.) Plaintiff further notes that Dr. Wun opined that Plaintiff would need to take at least one thirty minute break per day, and would be absent at least four times a month because of increased symptoms or treatment, and the ALJ gave no weight to these opinions, finding that Plaintiff would not be absent even half a day twice a month and that would have rendered a finding of disability and also discrediting Dr. Wun's opinions on the basis that they were not consistent with the "objective" medical findings and Plaintiff's statements regarding her ability to drive and go grocery shopping. (*Id*. at 14) Plaintiff additionally argues that there is nothing in the record to suggest that Dr. Wun's opinions were not based on her personal observations of Plaintiff and her interpretations of the objective medical records, which included diagnoses of severe conditions such as fibromyalgia (or chronic pain syndrome), as well as depression and anxiety, and imaging of her back. (*Id*.) Plaintiff further contends that her own statements about being able to go grocery shopping for small amounts of items up to three times a week or her ability to drive to doctor appointments and to her daughter's school also failed to be a specific and legitimate reason supported by substantial evidence in the record as a whole provided by the ALJ in giving Dr. Wun's opinion little weight since nowhere in the record states that she drives for more than two hours a day, which was Dr. Wun's prescribed upper limit for sustained sitting. (*Id*. at 14-15.)

In response, Defendant states that as the ALJ noted, Dr. Wun's treatment notes and other notes routinely showed normal physical findings. (Def.'s Opp'n at 3-4.) Defendant further asserts that although Plaintiff claims that Dr. Wun relied on objective physical findings, the ALJ correctly

noted that the record showed consistently normal gait, normal strength, sensation and/or reflexes, and mostly normal ranges of motion other than some reduced range of motion in the lower back. (*Id.* at 4.) Defendant also states that the ALJ noted that Plaintiff engaged in daily activities that were inconsistent with Dr. Wun's opinion of significant limitations. (*Id.*) Defendant also points out that here, Plaintiff prepared her own meals, cleaned the house, did laundry, drove, shopped, and managed money, she drove her daughter to work every day, and elsewhere admitted being able to drive for an hour at a time – clearly inconsistent with Dr. Wun's report that she could sit for only five minutes at a time. (*Id.*)

In reply, Plaintiff argues that the "normal" findings upon which the ALJ relied on for finding an "inconsistency" were not relevant to an opinion as to how Plaintiff's conditions would affect her work-related functioning and Dr. Wun's opinions were consistent with the findings of reduced range of motion in her back, muscle spasms, multiple tender trigger points, and even some muscle atrophy, which is only seen after extensive disuse of a muscle group. (Pl.s Reply at 4.) Plaintiff also asserts that Dr. Wun's opinions were consistent with imaging showing a disc protrusion and tear in her lower back, as well as neural foraminal narrowing and radiculopathy, consistent with her physical therapy records, where it was noted that she was fatigued within thirty minutes and that progress was slow and Dr. Wun's opinion regarding Plaintiff's ability to persist during an eight-hour day, and her need to take a thirty minute break during the day, or to be absent at least once a month, were not contradicted by any objective medical evidence when all of the relevant evidence is considered. (*Id.* at 4.) Moreover, Plaintiff reiterates her argument that her own statements about going grocery shopping or driving to doctor's appointments or her daughter's school do not amount to a specific and legitimate reason supported by substantial evidence in the record that the ALJ can use to justify her holding. (*Id.*) Plaintiff also states that nowhere in the record does it appear that she drives for more than two hours a day (Dr. Wun's prescribed upper limit for sustained sitting) and although this upper limit may be inconsistent with a restriction of sitting for no more than five minutes at a time, the ALJ did not provide a clear and legitimate rationale for discrediting any of Dr. Wun's other opinions, such as regarding Plaintiff's need for breaks or potential absences. (*Id.* at 4-5.)

Considering the arguments from both parties, the Court finds that the ALJ did not err in giving the opinion of Dr. Wun limited weight. An ALJ can reject a treating or examining doctor's opinion by "providing specific and legitimate reasons that are supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Ryan*, 528 F.3d at 1198)). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted). Here, the ALJ stated the reason why she gave Dr. Wun's opinion limited weight was because her opinion appeared to be largely based on Plaintiff's self-reported subjective limitations and did not correspond with Dr. Wun's objective physical examination findings. (AR 32.) The ALJ then provides a detailed and thorough summary of these findings and conflicting clinical evidence, e.g. that Plaintiff was not in acute distress, had full strength, full range of motion and that she experienced improvements with medication, and also cited extensively to the record (AR 31-32, 339-95, 876-93, 894-960, 1332-80). Moreover, the ALJ stated her reasonable interpretation that the subjective extreme limitations Plaintiff reported to Dr. Wun were inconsistent with the Plaintiff's reported activities of daily living, which involved regular driving, grocery shopping, and other activities inconsistent with the extreme limitations of, for example, being able to only sit for five minutes at a time before needing to get up or being able to sit or stand/walk for less than two hours each in an eight hour workday. (AR 31-32.) Therefore, contrary to Plaintiff's arguments, the ALJ did provide specific and legitimate reasons supported by substantial evidence in giving Dr. Wun's opinion limited weight.

2. **Dr. Radu**

Plaintiff next argues that the ALJ erred by giving the opinion of Dr. Felicia Radu limited weight. (Pl.'s Mot. at 15.) First, the Plaintiff asserts that the only evidence in the record suggesting that Dr. Radu was not impartial was the ALJ's own opinion regarding the Workers Compensation system, and that this did not rise to the level of substantial evidence and would render any claimant seen in the Workers Compensation system unable to use their treating doctors' opinions.

(*Id.* at 15-16.) Plaintiff further avers that the changes in Dr. Radu's opinion were minor and were all within a range of about five pounds difference and had to do with her ability to push or pull. (*Id.*) Plaintiff contends that as her condition by all accounts is one that would produce "good days" and "bad days," a range between five and ten pounds would be consistent with her conditions. (*Id.* at 16.) Plaintiff points out that Dr. Radu's opinions were related to Plaintiff's ability to perform functions on a daily basis for a sustained period of time over an entire workday and workweek, and thus, her ability to occasionally do laundry, or to carry light groceries three times a week, was not substantial evidence that could be used to discredit Dr. Radu's opinions. (*Id.*)

In response, Defendant asserts that the ALJ properly assigned less weight to the opinions from Dr. Radu because, among other reasons, they were inconsistent with the normal objective findings and Plaintiff's daily activities, which are reasons that were legitimate considerations under the regulations and case law. Defendant additionally argues that even though Dr. Radu's opinions stated that Plaintiff could lift 5-15 pounds, required a height adjustable table, a stress-relieving mat, an ergonomic mat, and should avoid intense, repetitive computer work, VE Scher's testimony at the hearing confirmed that someone with all the limitations Dr. Radu assessed could perform Plaintiff's past relevant work. (*Id.* at 4-5.) As such, Defendant contends, any error in evaluating Dr. Radu's opinions was harmless because even if the ALJ adopted them in full, she would have reached the same conclusion of non-disability. (*Id.* at 5.)

In reply, Plaintiff asserts that Defendant's harmless error argument is baseless, as the ALJ found that Plaintiff could not return to her prior skilled work. (Pl.'s Reply at 5.) Plaintiff also points out that the work that the ALJ found she could perform were all light jobs, which require the ability to lift and carry up to twenty pounds occasionally. (*Id.*) Plaintiff argues that Dr. Radu's opinion was for less than light work, which would have directed a finding of "disabled" according to the Medical-Vocational guidelines when Plaintiff turned 50 years old, as she was not found capable of skilled work by the ALJ. (*Id.*) Plaintiff contends that whether she could perform her past work with those restrictions was irrelevant as the ALJ found that her mental impairments restricted her to unskilled work, and as a result, it was harmful error for the ALJ to fail to provide clear and legitimate reasons for discrediting Dr. Radu's opinions. (*Id.*)

Upon consideration of the arguments from both parties, the Court finds that the ALJ did not err in assigning the opinions of Dr. Radu limited weight for similar reasons as discussed above as to Dr. Wun. The specific and legitimate reasons supported by substantial evidence from the record that the ALJ provided in giving Dr. Radu's opinions limited weight were that Dr. Radu was a paid consultant for the Plaintiff's Worker Compensation claim and the assessed limitations were specific to the Plaintiff's former job. (AR 32.) Moreover, the ALJ reasoned that Dr. Radu's assessed limitations conflicted with one another and the changes mentioned were not supported by changes in the objective medical evidence. (AR 32-33.) The ALJ then summarized his findings by stating that while the record supports Plaintiff has some limitations in lifting, pushing, and pulling, the assessed limitations are not as significant as opined by Dr. Radu (e.g., that Plaintiff could lift 5-15 pounds, required a height adjustable table, a stress-relieving mat, an ergonomic mat, and should avoid intense, repetitive computer work) given the minimal objective physical evidence and the Plaintiff's activities of daily living, e.g., doing laundry and carrying light groceries. (AR 33.) VE Scher's also testified at the hearing that someone with all the limitations Dr. Radu assessed could perform Plaintiff's past relevant work (AR 103-05). Accordingly, the Court agrees with Defendant's argument that any error in evaluating Dr. Radu's opinions was harmless because even if the ALJ adopted them completely, the finding of non-disability would still be the same. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination").

### 3. Dr. Thai

Plaintiff further argues that the ALJ erred in giving little weight to the opinion of Dr. Vinh Q. Thai. (Pl.'s Mot. at 16.) Plaintiff states that if the ALJ felt that there was such a significant period of medical improvement in Plaintiff's conditions, she should have evaluated the case for a closed period of time, or crafted an RFC for the time prior to this improvement. (*Id.*) Plaintiff also contends that the ALJ relied only on the parts of her mental status exams that were normal to find that it was inconsistent with Dr. Thai's opinions, ignoring his observations that indicated symptoms of depression and anxiety. (*Id.* at 17.) Plaintiff asserts that her daily activities did not contradict a finding by her treating psychiatrist that her depression and anxiety were severe,

caused functional limitations and would prevent her from functioning on a sustained basis in a competitive work environment. (*Id.*) Plaintiff further avers that because Dr. Thai was the treating psychiatrist, had a longitudinal record, and spent the most time with Plaintiff, his opinion should not have been discredited on the basis of the opinions of an examining doctor who met with her once, or by reviewing doctors who did not even have the majority of her records to review. (*Id.*) For example, Plaintiff argues that substantial evidence cannot be found in giving Dr. Radu's opinion (as a non-psychiatric doctor) as to the severity of her depression greater weight that of Dr. Thai (her psychiatrist) who met with her twice weekly, but then finding Dr. Radu's opinions as to her physical limitations to be discredited and not given any weight because they were more limiting than the ALJ's proposed RFC. (*Id.*) Plaintiff contends that this defies any reasonable interpretation of how weight should be given to medical opinions, and certainly goes against Social Security law and policy, because this type of picking and choosing only the parts of the opinions that supported the proposed RFC infected all of the decision. (*Id.*)

In response, Defendant points out that the ALJ assigned the least weight to statements from Dr. Thai that Plaintiff was not ready to return to work because, importantly, Dr. Thai's statements that Plaintiff could not work were not medical source statements and not entitled to any special weight, even if Dr. Thai was a treating source. (Def.'s Opp'n at 6.) Defendant also alleges that Plaintiff has not pointed to any medical source statement from Dr. Thai that says what Plaintiff can do and moreover, even considering Dr. Thai as a treating source, the ALJ noted that Dr. Thai's conclusions were inconsistent with progress notes showing significant improvement with treatment and some consistently normal findings on mental status examinations, as well as Plaintiff's daily activities. (*Id.* at 6-7.) Defendant also indicates that Plaintiff routinely showed intact memory and reasonable insight and judgment, significant improvement from treatment, Plaintiff's daily activities, as discussed above, showed mental abilities inconsistent with Dr. Thai's conclusions and although Plaintiff notes that the consistent reports of significant improvement did not begin until November 2014, the evidence is clear from that point forward that Plaintiff had significant improvement. (*Id.* at 7.) In addition, Defendant indicates that Drs. Starrett, Bilik and Meenakshi offered opinions based on examinations and treatment notes through at least

September 2014, and the ALJ rejected Dr. Thai's statements also for being inconsistent with these opinions. (*Id.*) Thus, Defendant concludes that the ALJ's consideration of these factors – Drs. Starrett, Bilik and Meenakshi's opinions and the subsequent evidence of significant improvement with treatment – covered the relevant period in full and provided a basis for rejecting Dr. Thai's conclusion and relying instead on the other doctors' opinions. (*Id.*)

In reply, Plaintiff states that Dr. Thai's opinion – which was given little weight by the ALJ because it was not found consistent with the treatment notes, the mental status exams and her daily activities, was not discredited because it was "not a treating source statement," and just because some portions of Plaintiff's mental status examinations were normal, such as her "insight and judgment," does not mean that the ALJ was free to ignore the more relevant signs and symptoms of her depression and anxiety, namely her mood and affect. (Pl.'s Reply at 6.) Plaintiff also avers that she never argued that she was incapable of working because she did not possess "insight" or "judgment," but because her anxiety and depression would require her to take excessive breaks or have too many absences. (*Id.*) Plaintiff further asserts that Dr. Thai's opinion as to the severity of Plaintiff's condition was relevant, material, and based on his personal observations and treatment and was consistent with the records as a whole; as a result, Plaintiff's daily activities did not contradict Dr. Thai's findings that her depression prevented her from functioning at work. (*Id.*)

Upon consideration of the arguments from both parties, the Court finds that the ALJ did not err in assigning the opinions of Dr. Thai limited weight for similar reasons as discussed above as to Drs. Wun and Radu. The specific and legitimate reasons supported by substantial evidence from the record that the ALJ provided in giving Dr. Thai's opinions limited weight were that they appear to not be wholly consistent with the progress notes, which document the Plaintiff's significant improvement with prescribed medication and psychotherapy. (AR 34.) Moreover, the ALJ reasoned that Dr. Thai's opinions were also not consistent with the mental status examination findings, the progress notes which indicated significant improvements in symptoms and the Plaintiff's activities of daily living. (AR 34, 1277-1328, 1492-93.) The ALJ further reasoned that Dr. Thai's assessment was inconsistent with the assessments from other examining and treating doctors given greater weight, which indicated that her mood was improved with medication and

her depression was mild to moderate. (AR 34, 339-395, 398-410, 792-98, 1384.) In making the above reasoning, the ALJ also provided a detailed and thorough summary of her findings and conflicting clinical evidence by citing extensively to exhibits in the record. (AR 33-34, 339-395, 398-410, 792-98, 1277-1328, 1384, 1492-93.)  Thus, the ALJ's reasoning in giving less weight to Dr. Thai's opinion is not only well-reasoned but also justified.

### 4.  *Gronowski Center Report*

Plaintiff additionally argues that the ALJ erred in giving little weight to the report from the Gronowski Center. (Pl.'s Mot. at 17.) Plaintiff primarily maintains that the ALJ gave only weight to those statements that supported her proposed RFC and ignored the rest of the evidence without a legitimate and specific reason for discrediting portions of a report by a treating source that was good enough to earn "great weight." (*Id*.) Thus, Plaintiff concludes that because the ALJ did not proffer any specific and legitimate reasons supported by substantial evidence for discrediting her treating doctor's opinions (including the opinions of Drs. Wun, Radu and Thai as well as the Gronowski Center providers), and had their opinions regarding her ability to persist through a workday and workweek been given proper weight, she would have been found unemployable and therefore, the decision not to include these restrictions was a prejudicial error. (*Id.*)

In response, Defendant states that even though Plaintiff argues that the ALJ did not give significant weight to the three-page letter from the treating sources at the Gronowski Center from March 2014, the ALH still discussed the letter and noted that its findings were consistent with the RFC finding, including evidence that Plaintiff could maintain concentration, showed normal memory and attention, and interacted appropriately with staff. (Def.'s Opp'n at 6.) Defendant also points out that Plaintiff complains that the Gronowski Center letter indicates that she cried during sessions and had significant stress, but evidence of crying and distress when discussing potentially painful mental health issues does not correlate to limitations in a work environment where an employee would not need to discuss and disclose such personal issues. (*Id*.) Defendant argues that at any rate, even if Plaintiff's reading of the Gronowski Center letter as supporting disabling limitations was a rational interpretation, the ALJ's contrary interpretation was also rational, and the reviewing Court must defer to the ALJ's conclusion. (*Id.*)

1    Plaintiff replies by asserting that the ALJ gave weight only to those statements that

2 supported her proposed RFC finding and ignored the rest without a legitimate and specific reason

3 for discrediting portions of a report by a treating source that was good enough to earn "great

4 weight." (Pl.'s Reply at 6.) Plaintiff further characterizes the ALJ's review as "cherry picking" in

5 how she credited one sentence in the Gronowski Center Report as being relevant because it stated

6 that Plaintiff or Ms. Iniguez brought checklists to help refresh Plaintiff's memory but the ALJ then

7 ignored the implications of the next sentence stating that Plaintiff still occasionally forgot some

8 questions. (*Id.* at 7.) Plaintiff also argues that the ALJ repeated this pattern for her entire

9 assessment of the Gronowski Center Report e.g., taking out only the sentences that supported her

10 decision and ignoring the favorable parts such as crediting the statement that Plaintiff could

11 interact with mental health professionals, but not the statement that psychological testing indicated

12 "clinically significant" relationship conflicts and also crediting the statement that Plaintiff was able

13 to maintain concentration when focusing on her feelings and thoughts, but not that staff observed

14 her crying frequently and being in acute distress. (*Id.*) Plaintiff further indicates that Defendant

15 argued that crying and being in distress while obtaining therapy would not be relevant to work-

16 related activities, but then by that same logic neither would the ability to maintain concentration

17 when discussing one's emotions, nor would the ability to interact with a treating therapist. (*Id.*)

18 The Plaintiff then argues that the ALJ "cannot have it both ways" specifically, anything that could

19 indicate the ability to function in the workplace being credited as such, and anything that could

20 indicate greater impairment is irrelevant to the workplace. (*Id.*) Plaintiff avers that this "highly

21 selective reading and crediting" of only the "unfavorable" portions of the Gronowski Center

22 Report is symbolic of the error poisoning the ALJ's overall assessment of the medical evidence

23 and opinions. (*Id.*)

24    On balance, the Court finds that the ALJ did not err in not giving significant weight to the

25 Gronowski Center Report for similar reasons as discussed above for Drs. Wun, Radu and Thai.

26 The specific and legitimate reasons supported by substantial evidence from the record that the ALJ

27 provided in giving the Gronowski Center Report limited weight included the ALJ's reasoning that

28 although Plaintiff reported difficulties with maintaining focus, the Gronowski Center providers

indicated that Plaintiff appeared able to maintain concentration when focusing on her feelings, thoughts, and behaviors; she was able to create handwritten and typed lists of topics she wanted to address at each psychotherapy session; and she was able to maintain concentration during discussions and for assessment purposes. (AR 34.) The ALJ further reasoned that although Plaintiff reported an impairment in her social interactions and the Plaintiff's responses on a self-reporting assessment indicated that Plaintiff experienced significant relationship conflicts, the Gronowski Center providers indicated that Plaintiff had normal social interactions with the therapist, supervisors, and clinic staff, and no direct behavior observations were made. (AR 34-35.)  The above-discussed rationale not only amounts to but also exceeds a detailed and thorough summary of conflicting findings and clinical evidence because the ALJ accurately and efficiently summarized the evidence in the Gronowski Center Report while also citing extensively to the record. (AR 34-35, 506-508.)  Accordingly, the Court finds that the ALJ's affording of limited weight to the Gronowski Center Report as both justified and well-reasoned.

### 5.  Dr. Starrett, Dr. Bilik, and Dr. Meenakshi

The ALJ gave the opinions of Dr. Richard A. Starrett, Ph.D., Dr. Harvey Bilik, Psy.D., and Dr. V. Meenakshi, M.D. great weight partly because they were all consistent with the record, and Defendant indicates that "notably, Plaintiff does not contest the ALJ's consideration of Dr. Starrett, Dr. Bilik, and Dr. Meenakshi's opinions as substantial evidence." (Def.'s Opp'n at 6-7.) Defendant asserts that the ALJ explained that Dr. Starrett's opinion was consistent with his examination other mental status examinations, and Plaintiff's daily activities, and as the record showed consistently intact memory and reasonable insight and judgment, Dr. Starrett's examination of Plaintiff found generally normal mental status. (*Id.* at 5.) Defendant also indicated that Plaintiff's daily activities included managing her own finances, attending church groups as well as family gatherings, and planning a trip to Los Angeles with her siblings to take care of her ailing uncle. (*Id.*) Thus, Defendant argues that given this evidence, the ALJ reasonably assigned significant weight to Dr. Starrett's opinion that Plaintiff could handle simple and detailed instructions and interact with others. (*Id.*) Moreover, Defendant contends that the ALJ also reasonably assigned great weight to the similar opinions of Dr. Bilik and Dr. Meenakshi for the same reasons. (*Id.*)

The Court agrees with Defendant that the ALJ properly assigned the opinions of Drs. Starrett, Bilik and Meenakshi great weight. In other words, the ALJ provided a detailed and thorough summary of findings and clinical evidence to make a reasoned conclusion by stating that Dr. Starrett's assessment was consistent with his psychological consultative examination findings, the objective findings of record (which show that Plaintiff's concentration and memory are within normal limits and the Plaintiff was cooperative during doctor's appointments), and the Plaintiff's activities of daily living which include social activities with friends and family members. (AR 35.) The ALJ performs similar well-reasoned analysis in stating that although Drs. Bilik and Meenakshi were not treating or examining sources, they had the opportunity to independently review the records in the case, and their opinions are consistent with the objective evidence of record and the Plaintiff's ability to drive, grocery ship every three days, and maintain long-term friendships with friends and co-workers. (*Id.*) In addition, because the above provided reasons are specific and legitimate as well as supported by substantial evidence, the ALJ is justified in her granting of great weight to the opinions of Drs. Starrett, Bilik and Meenakshi. *See Garrison,* 759 F.3d at 1012 ("an ALJ may only reject [a treating or examining doctor's opinion] by providing specific and legitimate reasons that are supported by substantial evidence.")

## B.   The ALJ's Evaluation of Plaintiff's Credibility

Next, Plaintiff argues that the ALJ erred by not providing clear and convincing reasons, or by failing to consider the entire case record, in the evaluation of her credibility. (Pl.'s Mot. at 18.) Specifically, Plaintiff argues that none of the ALJ's stated reasons for discrediting Plaintiff's statements – (1) she worked after the onset of her pain, (2) her behavior at the hearing was evasive and vague, (3) she was engaged in "relatively normal activities," (4) her pain was not consistent with objective medical evidence, and (5) her treatment was routine and conservative – provide a clear and convincing justification for discrediting Plaintiff's statements regarding her limitations. (*Id.* at 18-19.) Plaintiff then argues why each of the five above stated reasons from the ALJ do not amount to clear and convincing evidence by refuting them. (Pl.'s Mot. at 20-21.)

In response, Defendant asserts that the ALJ offered numerous reasons supported by substantial evidence for her findings, and responds in turn to Plaintiff as to why each of the five

above stated reasons were not only clear and convincing but sufficiently specific findings. (Def.'s

Opp'n at 7-9.) The Defendant then goes on to offer four more sufficiently specific findings from

the ALJ to bolster the argument that the ALJ provided valid reasons supported by substantial

evidence, specifically: (6) the ALJ finding that Dr. Starrett in his August 2014 examination found

poor effort and cooperation on behalf of Plaintiff, (7) the ALJ noting that Plaintiff's activities were

inconsistent with her alleged disability, (8) the ALJ finding that the evidence of improvement from

treatment undermined Plaintiff's claimed disabling limitations, and (9) the ALJ noting that the

objective evidence, including normal posture and gait, minimal tenderness, full range of motion of

bilateral shoulders, elbows, wrist, and hips, knees, and ankles; normal strength, normal sensory

and reflexes; and imaging studies showing mild degenerative changes and only mild to moderate

stenosis at most, undermined Plaintiff's allegations as well (*Id.* at 9-11.) In reply, Plaintiff

responds briefly to all nine of the points raised by Defendant with the same arguments they raised

in their initial motion. (Pl.'s Reply at 9-12.) Defendant concludes by stating that even though

Plaintiff takes issue with several of the ALJ's findings, she offers only a completing interpretation

of the record, because the ALJ is the fact-finder and the Court should defer to the ALJ's finding

even where the record is susceptible to more than one rational interpretation. (Def.'s Opp'n at 11.)

(citing *Burch*, 400 F.3d at 679.) Therefore, Defendant concluded that because the ALJ provided

valid reasons supported by substantial evidence, the Court should affirm the ALJ's decision.

(Def.'s Opp'n at 11) (citing *Thomas*, 278 F.3d at 959 ("[i]f the ALJ's credibility finding is

supported by substantial evidence in the record, we may not engage in second-guessing.")

      Upon consideration of the parties' arguments, the Court finds that the ALJ did not err in the

evaluation of Plaintiff's credibility and in doing so, did provide clear and convincing reasons and

also considered the entire case record. In assessing the credibility of a claimant's testimony

regarding subjective pain or the intensity of symptoms, the ALJ must engage in a two-step inquiry.

*Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). An ALJ must first determine "whether the

claimant has presented objective medical evidence of an underlying impairment which could

reasonably be expected to produce the pain or other symptoms." *Lingenfelter v. Astrue*, 504 F.3d

1028, 1036 (9th Cir. 2007) (internal quotations and citations omitted). At this step, a claimant need

not show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* Next, if a claimant meets this first prong and there is no evidence of malingering, the ALJ must then provide "specific, clear and convincing reasons" for rejecting a claimant's testimony about the severity of his or her symptoms. *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). In evaluating the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n. 3 (9th Cir. 2010) (quoting *Smolen*, 80 F.3d at 1284). For example, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80 F.3d at 1284); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter*, 504 F.3d at 1040. Even though a claimant need not "vegetate in a dark room" in order to be eligible for Social Security Income benefits, certain activities or behavior may support a finding of no disability. *See Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir.1981)). For instance, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Fair*, 885 F.2d at 603. Even when those activities suggest some difficulty functioning, they may still be used as grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225; *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

Here, the ALJ properly evaluated the Plaintiff's credibility under the aforementioned two-step analysis. As to the first prong, the ALJ found that Plaintiff's underlying impairments could reasonably be expected to cause the alleged symptoms. (AR 29.) However, the ALJ also legitimately found that Plaintiff's statements considering the intensity, persistence and limiting effects of those symptoms were not entirely credible. (*Id.*) As to the second prong, the ALJ provided specific, clear and convincing reasons and also used ordinary techniques of credibility

evaluation. For example, the ALJ cited Plaintiff's strong work history as a Data Analyst at the County of San Mateo for close to 15 years (AR 29) and how even though Plaintiff filed a Worker's Compensation claim in March 2012 and was briefly off work during this time, the record reveals that her allegedly disabling impairments were present at approximately the same level of severity prior to her alleged onset date (of August 7, 2013), and yet she was able to return to work at substantial gainful activity levels. (AR 29, 339-95, 611-80.) The ALJ also legitimately stated that the fact Plaintiff's impairments did not prevent her from working, albeit with accommodations, strongly suggests that Plaintiff's condition is not disabling. The ALJ further justifiably reasoned that while she recognized that the Plaintiff's impairments prevent her from returning to her past work, the inability to do one's past work does not establish "disability" for social security purposes if the individual can do other, less-demanding work, which the objective and opinion evidence of the record supports. (AR 29.) The ALJ is also warranted in reasoning that this is also supported by Plaintiff's own statements to her psychiatrist about reaching out to her employer about returning to work with a different job that could accommodate her disability (AR 29, 1304.) The ALJ further reasonably notes that the records suggest that there may be reasons, other than disability, that explain why the Plaintiff does not want to return to her previous position. (AR 29, 1334.)

The statement from the ALJ that Plaintiff's responses while testifying at the hearing were evasive and vague at times is not significant to the analysis of the Plaintiff's credibility. What is more important is how consistent her testimony, or the rest of the medical evidence, is consistent with the overall record. Here, the ALJ properly examined these consistencies by pointing out that in contrast to the Plaintiff's alleged chronic pain and seemingly debilitating functional limitations, she still engaged in relatively normal activities such as driving her daughter to and from school every day, driving herself to doctor appointments, driving to Redwood City and/or other places more than 30 minutes or more away, going grocery shopping three times a week, walking the aisles without an assistive device, indicating that she could perform light household chores such as laundry and dishes and also prepare simple meals and salads, being able to attend weekly psychotherapy sessions, exercising, attending physical and aqua therapy sessions two to three times a week, attending family gatherings, church events, and other social events, all behavior and

34

activities that the ALJ validly characterized as not being as limited as alleged. (AR 29, 47-110, 472, 487, 794, 963, 1304.) The ALJ performed similar in-depth analysis by going through the treatments that Plaintiff received for her alleged pain and functional limitations, her physical examinations indicating that she had normal posture and gait (AR 30, 411-502, 539-610, 611-80, 771-91, 1381-1408, 1499-1503, 1504-09, 1510-18), the imaging studies not supporting Plaintiff's allegations of disabling symptoms and limitations, an examination from a rheumatologist indicating that there was no evidence of any significant inflammatory disease or unusual degenerative changes, no longer exercising or getting physical therapy when recommended to do so by medical professionals in order to alleviate her chronic pain. (AR 30.)

The ALJ also properly gave more weight to the testimony of ME Levine, because although he was not a treating or examining physician, he is board certified in Orthopedic Surgery, has practiced as an orthopedist for a significant number of years, and this experience provides him with the knowledge, training and a perspective not shared by the other physicians of record which could reasonably be expected to give him greater insight into the limitations imposed by the Plaintiff's impairments. (AR 31.) Moreover, as an expert witness before the SSA, ME Levine has knowledge of the social security disability program and had access to all of the medical evidence of record when he offered his opinion, and also had the opportunity to ask the Plaintiff specific questions. (*Id.*) His opinion was also more objective as it was not related to Plaintiff's Workers Compensation claim. (*Id.*) Thus, the Court finds that as the final arbiter and fact-finder with the entire record at her disposal, which she also properly and thoroughly analyzed, the ALJ did not err in evaluating the Plaintiff's credibility. *See Tommasetti,* 533 F.3d at 1041-42.

## C. The ALJ's Burden at Step Five

Plaintiff further argues that the ALJ failed to meet her burden at Step Five, as her findings were not supported by substantial evidence. (Pl.'s Mot. at 21.) Plaintiff mentions to help meet this burden, the ALJ has a Vocational Expert or VE testify, and here VE Scher testified at the hearing. (*Id.*) However, Plaintiff alleges that the ALJ may only meet her burden at Step Five if her hypothetical is complete, otherwise the ALJ cannot rely on the VE testimony. (*Id.*) Plaintiff thus argues that here, the ALJ failed to include all of the limitations in the decision's RFC in her

35

hypothetical posed to VE Scher because the ALJ found Plaintiff to be off task by ten percent, and this additional limitation was not included in the complete hypothetical given to VE Scher when she testified as to what jobs would be available. (*Id*. at 21-22.) For example, Plaintiff points out that the ALJ did ask a separate question about time off for her "hypothetical worker" and VE Scher's testimony was that individuals who could either (a) not "get caught" or (b) could time being "off task" with time periods wherein fact they did not have any tasks would be capable fo working even if they were off task 15% of the time. (*Id*. at 22.) Plaintiff argues that neither of these qualifiers were included in the ALJ's RFC (e.g., it was not "would be off task ten percent of the time, but only while not having tasks to do or while not getting caught") (*Id*. at 22.) Thus, Plaintiff contends that it is unclear if an individual who would not be able to time their "off task" percentage to correspond to "down time" would be able to perform competitive work, given all of the other restrictions also in place in the proposed RFC (*Id*. at 22.)

In response, Defendant asserts that because the ALJ relied on the testimony of VE Scher for her Step Five finding, the Court should affirm her decision. (Def.'s Opp'n at 11.) (citing *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001) ("There are two ways for the Commissioner to meet his Step Five burden: (1) the testimony of a [vocational expert]; or (2) by reference to the Medical-Vocational Guidelines"). At the hearing, VE Scher testified that an individual who was off-task up to 15% of the workday could work as a laundry worker, office helper, or photocopy machine operator (AR 101), and because the ALJ found that Plaintiff would be off-task only 10% of the day *AR 28), Defendant avers that VE Scher's testimony about being off-task is consistent with the ALJ's conclusion that Plaintiff could work as a laundry worker, office helper, or photocopy machine operator (AR 38-39). (Def.'s Opp'n at 11.) Defendant further contends that Plaintiff's argument that VE Scher's testimony considered only a person who had the ability to avoid getting caught is not the only rational interpretation of the testimony. (*Id.*) Defendant notes that VE Scher also stated that "there's nobody that's on-task 100 percent of a workday and it's just a matter of if they get caught, [that] kind of thing. So, office helper and office jobs and jobs where you're not–there's not somebody hanging over your shoulder every minute, there's a better chance of allowing that kind of thing. But I think 15 percent is the top," and that

"there's some downtime in laundry workers' jobs" and also for photocopy machine operators. (*Id.*)
Thus, the Defendant argues that the ALJ reasonably found that the reduced supervision in these
three occupations meant that an employee could still perform the job roles successfully even if she
was off-task up to 15% of the time. (Def.'s Opp'n at 11-12.) Defendants conclude by arguing that
even if Plaintiff's reading of VE Scher's testimony was rational, the Court should defer to the
ALJ's at least equally rational interpretation of that same testimony. (*Id.* at 12.)

In reply, Plaintiff reiterated her arguments and also added that even though Defendant
stated those jobs (e.g., laundry worker, office helper, or photocopy machine operator) had
"reduced supervision," Defendant failed to cite to any evidence in the record for that supposition.
(Pl.'s Reply at 12-13.) Plaintiff also indicates that the ALJ did not restrict contact with supervisors
in the hypothetical that she posed to the VE (AR 99). (Pl.'s Reply at 13.) Plaintiff thus states such
a level of supervision was someone not "hanging over your shoulder every minute." (*Id.*)

On balance, the Court finds that the ALJ did not fail to meet her burden at Step Five
because her findings were supported by substantial evidence. The ALJ is the final arbiter and fact-
finder, and can resolve ambiguities however they so choose. *See Tommasetti,* 533 F.3d at 1041-42
(the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence.")
Therefore, even though Plaintiff is entitled to her own interpretation of VE Scher's testimony, it is
Defendant's and the ALJ's interpretation that will trump. Accordingly, because the ALJ found that
Plaintiff would be off-task only 10% of the day, VE Scher's testimony about being off-task is very
much consistent with the ALJ's Step Five finding that Plaintiff could work as a laundry worker,
office helper or photocopy machine operator.

**D.      Remanding for Payment of Benefits or Further Proceedings**

Plaintiff asserts that if further development of the record is unnecessary, then the district
court should avoid creating a need for additional administrative hearings and a longer wait for a
remedy for the claimant by remanding for an immediate award of benefits. (Pl.'s Mot. at 22)
Plaintiff further alleges that as there are significant issues as to what Plaintiff's RFC was, and
whether any employment would exist if a proper RFC hypothetical was given to VE Scher, this
case should be remanded for further development. (*Id.*)

In response, Defendant argues that the Court should affirm the Commissioner's final decision but should the Court disagree, the proper remedy is a remand for further proceedings. (Def.'s Opp'n at 12.) Defendant notes that although Plaintiff asks the Court to credit certain evidence as true and remand for payment of benefits, as a matter of record, the Commissioner disagrees with the credit-as-true rule. (*Id.*) (citing Vasque, 572 F.3d at 601.) Defendant also cites a Ninth Circuit case for the proposition that an award of benefits should only be ordered in narrow circumstances, and remanding for further proceedings is "the proper course, except in rare circumstances," when the court does not affirm the agency's decision. (Def.'s Opp'n at 12.)

Upon consideration of the parties' arguments, the Court sees no reason to remand for payment of benefits or for further proceedings. Because the ALJ's decision is supported by substantial evidence and well-reasoned analysis, it is also free from reversible legal error. As a result, the credit-as-true rule or the *Treichler* holding suggesting a remand for further proceedings are inapplicable here. Accordingly, the ALJ's decision is affirmed.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED, and Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court shall close this case.

IT IS SO ORDERED.

Dated:

_____
KANDIS A. WESTMORE
United States Magistrate Judge